# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-03124-STV

JOSEPH D. DURAN, JR.,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER,
by and through its BOARD OF WATER COMMISSIONERS,

      Defendant.

_____

## ORDER
_____

Magistrate Judge Scott T. Varholak

      This matter comes before the Court on Plaintiff's Motion for Partial Summary Judgment [#30] and Defendant's Motion for Summary Judgment [#31] (collectively, the "Motions"). The Motions are before the Court on the parties' consent to have a United States magistrate judge conduct all proceedings in this action and to order the entry of a final judgment. [##18, 20] This Court has carefully considered the Motions and related briefing, the entire case file, and the applicable case law, and has determined that oral argument would not materially assist in the disposition of the Motions. For the following reasons, Plaintiff's Motion for Partial Summary Judgment [#30] is **DENIED**, and Defendant's Motion for Summary Judgment [#31] is **GRANTED in part** and **DENIED in part**.

## I.    BACKGROUND

This case arises out of the decision of the City and County of Denver, acting by and through its Board of Water Commissioners ("Denver Water"), not to promote Plaintiff Joseph Duran to the Customer Relations Manager position.  [*See generally* #1]  The undisputed facts are as follows.[1]

Plaintiff, who is Mexican-American, has worked for Denver Water since 1985. [#38-1, WSOF2-3; *see also* #39-1, DSOF17-18]  In June 2014, Denver Water posted a job opening for the Sales Administration Supervisor position in the Customer Relations section of Denver Water.  [#38-1, WSOF7]  Denver Water employee Vince Gaiter, who is African American, was selected for the Sales Administration Supervisor position.  [*Id.* at WSOF8-9]  After Mr. Gaiter was selected for the position, Denver rebid the position, and Plaintiff applied.  [*Id.* at WSOF10-11]  Plaintiff later realized that Mr. Gaiter had been selected for the position before it was posted for the second time.  [*Id.* at WSOF13] Plaintiff emailed Alice Montez, a human resources specialist, and Lyndsay Schulz, the hiring manager for the position, among others, complaining that the hiring process was unfair, did not present an equal opportunity, and that Mr. Gaiter had been preselected. [*Id.* at WSOF15-19]

---

[1] The undisputed facts are drawn from the Separate Statement of Facts filed with Defendant's Motion for Summary Judgment (the "Denver Water Statement of Facts") [#38-1] and the Separate Statement of Facts filed with Plaintiff's Partial Motion for Summary Judgment (the "Duran Statement of Facts") [#39-1].  The Court refers to the sequentially numbered facts set forth in the Denver Water Statement of Facts as "WSOF#" and refers to the sequentially numbered facts set forth in the Duran Statements of Facts as "DSOF#."  The Court periodically cites directly to the exhibits cited by the parties to provide additional context.

In the summer of 2016, Denver Water posted a vacancy announcement for the position of Customer Relations Manager. [*Id.* at WSOF22; #39-1, DSOF1, 25] The minimum qualifications for the position were listed as follows: a bachelor's degree from an accredited college or university in business or public administration, or a related field; minimum seven years of related work experience, including three years in a supervisory role; and "[a]ny equivalent combination of training, education, and experience that provides the required skills, knowledge and abilities." [#39-1, DSOF2; #32-2 at 3] The job posting indicated that the Customer Relations Manager would "plan, direct, strategize and coordinate the operations of the Customer Service Field section at Denver Water," including taking on responsibility for improving performance, productivity, and efficiency "to ease the process of doing business with Denver Water." [#32-2 at 1] The job description listed several "Essential Duties and Responsibilities," including, by way of example: "formal supervisory responsibilities over the employees with[in] the areas of the Customer Service Field section[,] i.e. Meter Shop, Meter Reading, Meter Inspection, Field Service and Central Dispatch," plan meter reading projects, build relationships with partners to build a better reputation in the water industry, manage section budget, and actively manage activities of supervisors and staff.[2] [*Id.* at 1-3; #39-1, DSOF3-7]

Denver Water received over 80 applications in response to the Customer Relations Manager posting. [#38-1, WSOF31] Plaintiff applied in the fall of 2016. [#39-1, DSOF16]

_____

[2] Plaintiff also cites to documents describing the job descriptions and qualifications for the position of Customer Service Field Manager. [#39-1, DSOF9-15] It is undisputed that the Customer Service Field Manager position preceded, and is distinct from, the Customer Relations Manager position at issue here, though the positions and descriptions thereof are very similar. [*See id.*; *see also id.* at WSOF44-46, 49] The Court summarizes the facts directly pertinent to the Customer Relations Manager position.

Michael Aragon, who had previously held the position[3] and who identifies as Hispanic, was the hiring manager for the Customer Relations Manager position. [*Id.* at DSOF8; #38-1, WSOF22-23, 25] The individual selected as the new Customer Relations Manager would report directly to Mr. Aragon. [#38-1, WSOF26] Mr. Aragon worked with Alice Montez in Human Resources, who is Mexican-American and also identifies as Hispanic, on the recruitment and selection process for the position. [*Id.* at WSOF27-28] Mr. Aragon, Ms. Montez, and Mary Faulkner, Director of Human Resources - Talent, reviewed the applications and determined that 12 candidates met the minimum requirements for the position. [*Id.* at WSOF32-33] Of those 12 applicants, six were internal applicants and included Plaintiff and John Plonsky, another Denver Water employee. [*Id.* at WSOF33]

At the time of his application, Plaintiff had more than 31 years of work experience with Denver Water, including ten years as a Water Distribution Manager. [#39-1, DSOF18-19] Plaintiff has been promoted five times since 1985 in the Water Distribution Administration, a section of Denver Water's Operations & Maintenance Division. [#38-1, WSOF4] As a Water Distribution Manager, Plaintiff directly supervises six individuals, who in turn collectively supervise a total of 28 employees. [*Id.* at DSOF149] Employees in the Water Distribution Administration perform various functions related to the operation and maintenance of the water distribution system, including responding to customer inquiries, leak investigations, valve operations, water quality complaints, and main breaks. [*Id.* at WSOF6] Plaintiff previously worked as an Emergency Services Supervisor and a System Quality Supervisor before he became a Water Distribution Manager. [*Id.*

---

[3] As described *supra* n.2, when Mr. Aragon held the position, it was known as Customer Service Field Manager, and was slightly different than the Customer Relations Manager position.

at DSOF132]  At the time he applied for the Customer Relations Manager job, Plaintiff had taken dozens of safety courses on plumbing, electricity, safety, and related issues. [*Id.* at DSOF147]

Mr. Plonsky is Caucasian.  [*Id.* at WSOF35]  The parties dispute the extent of Mr. Plonsky's work experience, but both cite to Mr. Plonsky's resume.  [*Id.* at WSOF34, 90; #39-1, DSOF22; *see also* #32-9]  According to Mr. Plonsky's resume, he had nearly seven years of experience at Denver Water as a Finance Supervisor/Manager at the time he applied for the Customer Relations Manager position.  [#38-1, WSOF34; #39-1, DSOF22] As a Finance Supervisor/Manager, he supervised a total of four employees, none of whom was a supervisor.  [#38-1, DSOF150]  Mr. Plonsky had additional supervisory experience as an Accounting Supervisor for the Douglas County Government between January 2005 and September 2009, supervising an accounts payable team.  [*Id.* at WSOF91]  Mr. Plonsky also worked for Denver Water as an Accountant II between October 2002 and January 2005, supervising three technicians.  [*Id.* at WSOF92; #32-9] The parties apparently disagree as to Mr. Plonsky's total years of supervisory experience because they dispute the extent of his supervisory responsibilities as an Accountant II, but nevertheless it appears undisputed that Mr. Plonsky had at least 11.5 years of supervisory experience, from his time as a Finance Supervisor/Manager with Denver Water and as an Accounting Supervisor for the Douglas County Government.  [*See id.* at WSOF90]  Prior to applying for the Customer Relations Manager position, the majority of Mr. Plonsky's training at Denver Water had been in finance and general management courses, with one training class on "Elect. Safety Gen[eral] Awareness."  [*Id.* at DSOF148; *see also* #36-9 at 4-5]

Ms. Montez and Mr. Aragon reviewed answers to written questions submitted by the qualified candidates to determine which candidates to interview. [#38-1, WSOF36] Plaintiff and Mr. Plonsky were both selected for interviews. [*Id.* at WSOF37] Ms. Montez and seven other Denver Water employees conducted the first round of interviews on October 31, 2016. [*Id.* at WSOF38, 41] The interviewers were provided with a form to rate candidates in eight categories, including knowledge and technical skills, education and training, work experience, communication and interpersonal skills, and leadership. [*Id.* at WSOF41-43] All of the interviewers recommended that Plaintiff and Mr. Plonsky advance to the final interview. [*Id.* at WSOF44] No other candidates advanced to the second round of interviews. [*Id.* at WSOF48]

The second interview was conducted on November 18, 2016 by Mr. Aragon, his manager and Chief Public Affairs Officer Sally Covington, Michelle Garfield, and Lyndsay Schulz. [*Id.* at WSOF46, 49] Each of the four interviewers rated Mr. Plonsky higher than Plaintiff in most categories, using the same rating form as in the first round of interviews. [*Id.* at WSOF49-50] In his comments regarding Plaintiff, Mr. Aragon wrote, "Didn't answer all the questions. Canned responses[—]made sure to use certain phrases, but they didn't always fit. Went into left field on some Qs." [*Id.* at WSOF55] With respect to Mr. Plonsky, Mr. Aragon wrote, "Good interview & responses," and noted that Mr. Plonsky was "[g]enuine," "[t]houghtful," and "prepared." [*Id.* at WSOF54]

Mr. Aragon testified that it was difficult to choose between Plaintiff and Mr. Plonsky. [*Id.* at WSOF65] In his testimony, Mr. Aragon indicated that he did not know whether Mr. Plonsky had ever touched any of the tools or equipment used in "the installation, maintenance, testing, reading, and repair of water meters," whether Mr. Plonsky had ever

seen a water meter, or whether Mr. Plonsky had any field work, metering, meter-reading system technology, plumbing, basic backflow, or hydraulics experience. [*Id.* at DSOF131] Mr. Aragon testified that Mr. Plonsky had knowledge of standard practices used in meter reading, but was not familiar with those practices for installation, maintenance, testing, or repair of water meters. [#31-6 at 69:17-70:14] In contrast, Mr. Aragon noted that Plaintiff's extensive field work experience exceeded that of Mr. Plonsky, but explained that not all this experience was directly transferable to the customer service realm, and both candidates would need to learn the customer service component of the position. [#38-1 at WSOF66-67, 71]

While Plaintiff had more of a technical background, and was closer to learning the customer service field side of the Customer Relations Manager position, Mr. Aragon believed that Mr. Plonsky was "much closer" to a stronger "leadership and communication style." [*Id.* at WSOF77] Because Mr. Aragon felt that Mr. Plonsky's "leadership and communication skills were far superior to Plaintiff's," Mr. Aragon believed that Mr. Plonsky could learn the technical aspects of the job and would be successful in the role. [*Id.* at WSOF81] Mr. Aragon determined that it would be easier for him to teach the technical skills to Mr. Plonsky, whereas it would be more difficult for Mr. Aragon to teach, and for Plaintiff to gain, communication and other soft skills. [*Id.* at WSOF82, 84] Mr. Plonsky was ultimately selected for the Customer Relations Manager position. [#39-1, DSOF21]

Plaintiff initiated this action in December 2017 asserting four claims for relief: national origin discrimination, in violation of Title VII and the Fourteenth Amendment Equal Protection Clause, and retaliation for opposing a violation of Title VII, in violation of Title VII and the Fourteenth Amendment Due Process Clause. [#1 at 5-8] The parties

filed cross motions for summary judgment on November 13, 2018. [##30, 31] Plaintiff's Motion for Partial Summary Judgment seeks summary judgment on the issue of liability on Plaintiff's national origin discrimination claims. [##30, 32] Plaintiff contends that Defendant cannot articulate a legitimate non-discriminatory reason for its decision not to promote Plaintiff, because Mr. Plonsky was demonstrably unqualified. [*See generally id.*] In Defendant's Motion for Summary Judgment, Defendant argues that it is entitled to summary judgment on all of Plaintiff's claims. [#31] According to Defendant, it had legitimate, non-discriminatory reasons for not promoting Plaintiff, Plaintiff has failed to establish that Defendant's reasons for not promoting him were pretextual, and Plaintiff cannot demonstrate municipal liability. [*Id.* at 7-16] Defendant further argues that Plaintiff cannot prevail on his retaliation claims because he did not engage in protected activity, and regardless, there was no causal connection between the alleged protected activity and the decision to not promote Plaintiff. [*Id.* at 16-18]

## II.    STANDARD OF REVIEW

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994). Where, as here, the Court is presented with cross-motions for summary judgment, the Court "must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor." *United States v. Supreme Court of New Mexico*, 839 F.3d 888, 907 (10th Cir. 2016) (internal quotations omitted).

When the moving party bears the burden of persuasion at trial, "the moving party must establish, as a matter of law, all essential elements of the [claim on which summary judgment is sought] before the nonmoving party can be obligated to bring forward any specific facts alleged to rebut the movant's case." *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008). In other words, the moving party "must support its motion with credible evidence showing that, if uncontroverted, the moving party would be entitled to a directed verdict." *Rodell v. Objective Interface Sys., Inc.*, No. 14-CV-01667-MSK-MJW, 2015 WL 5728770, at *3 (D. Colo. Sept. 30, 2015) (citing *Celotex Corp.*, 477 U.S. at 331). "The burden then shifts to the non-moving party to produce evidence demonstrating the existence of a genuine factual issue for trial." *Id.*

When the moving party does not bear the burden of persuasion at trial, the movant may satisfy its initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998). If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial." *Id.* at 671 (quotation omitted).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210

F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987).  A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party.  *Anderson,* 477 U.S. at 248.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

**III.    Analysis**

Plaintiff asserts four claims for relief: national origin discrimination, in violation of Title VII and the Fourteenth Amendment Equal Protection Clause, and retaliation for opposing a violation of Title VII, in violation of Title VII and the Fourteenth Amendment Due Process Clause.  [#1 at 5-8]  The Court first addresses the instant Motions as they pertain to the national origin discrimination claims (Claims One and Three) and then addresses Defendant's Motion for Summary Judgment on Plaintiff's retaliation claims (Claims Two and Four).

**A.  National Original Discrimination (Claims One and Three)**

Plaintiff can prove a failure-to-promote claim based on his national origin "either (1) by direct evidence that a workplace policy, practice, or decision relies expressly on a protected characteristic, or (2) by using the burden-shifting framework set forth in [*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)]."  *Young v. United Parcel Serv., Inc.*, 135 S. Ct. 1338, 1345 (2015).  Here, in the absence of an explicit decision that Defendant refused to promote Plaintiff because of his national origin, Plaintiff must rely

upon the *McDonnell Douglas* test.  Under that framework, the burden begins with Plaintiff to show that he: (1) is a member of a protected class; (2) applied for and was qualified for the position; (3) was not promoted despite his qualifications; and (4) the position was filled after he was rejected.  *Jones v. Barnhart*, 349 F.3d 1260, 1266 (10th Cir. 2003).

The parties agree that Plaintiff has established a prima facie case of failure to promote based on his national origin—Plaintiff is Mexican-American, applied for the position of Customer Relations Manager and was qualified for that position, but despite his qualifications he was not selected and Defendant instead promoted Mr. Plonsky, a Caucasian employee.  [#39-1 at DSOF16-21; *see also* #31 at 6; #32 at 4]  The Court thus proceeds to the next step of the burden shifting framework.  *See, e.g.*, *Jaramillo v. Colo. Judicial Dep't*, 427 F.3d 1303, 1307 n.1 (10th Cir. 2005) (noting the court would not resolve the case on the adequacy of plaintiff's prima facie discrimination case because the parties agreed she had satisfied her burden).

Once the plaintiff has established a prima facie case, "the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action." *Jones*, 349 F.3d at 1266; *see also Reeves v. Sanderson Plumbing Prods., Inc*. 530 U.S. 133, 142 (2000).  "If the defendant is able to articulate a valid reason, the plaintiff can avoid summary judgment only if []he is able to show that a genuine dispute of material fact exists as to whether the defendant's articulated reason was pretextual." *Perry v. Woodward*, 199 F.3d 1126, 1135 (10th Cir. 1999).  The analysis of a national origin discrimination claim under Title VII and 42 U.S.C. § 1981 is the same, except that under § 1981 Plaintiff must present additional evidence that a municipal defendant was acting

pursuant to a custom of discriminatory employment practices.  *Randle v. City of Aurora*, 69 F.3d 441, 446 n.6, 446-47, 450-51 (10th Cir. 1995).

### 1.  Defendant's Nondiscriminatory Reasons

The parties first dispute whether Defendant has presented legitimate, non-discriminatory reasons for its decision to hire Mr. Plonsky over Plaintiff.  Because the motions for summary judgment overlap here, the Court will address the legal arguments together.  *See Azzun v. Kan. Dep't of Health & Env't*, No. 09-4144-SAC, 2010 WL 4975557, at *1 (D. Kan. Dec. 2, 2010).

Defendant's "burden to articulate a nondiscriminatory reason has been characterized as an exceedingly light one."  *Anaeme v. Diagnostek, Inc.*, 164 F.3d 1275, 1279 (10th Cir. 1999) (quotation omitted).  Defendant "need not persuade the court that it was actually motivated by the proffered reasons."  *Id.* (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  Instead, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff."  *Id.* (quoting *Burdine*, 450 U.S. at 254).  In other words, Defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus," to satisfy its burden.  *Burdine*, 450 U.S. at 257.

Courts have repeatedly held that a candidate's superior communication and leadership skills, as well as better interview performance, are legitimate, non-discriminatory reasons for selecting such a candidate.  *See, e.g.*, *Diaz v. Okla. Bureau of Narcotics & Dangerous Drugs Control*, No. CIV-14-0821-F, 2016 WL 9022584, at *2 (W.D. Okla. July 5, 2016) (finding candidate's "demonstrated leadership capabilities" and

"direct answers to the interview questions with a clear vision" for the position were legitimate, nondiscriminatory reasons for selecting that candidate over plaintiff for a promotion). For example, in *Meredith v. Beech Aircraft Corp.*, the Tenth Circuit held that defendant's assertions that plaintiff was not promoted because she lacked the interpersonal, leadership, and communication skills necessary for the position were legitimate, non-discriminatory reasons for the decision. 18 F.3d 890, 894 (10th Cir. 1994); *see also Medina v. Harvey*, No. CIV 04-1236 LCS/KBM, 2005 WL 8163483, at *3 (D.N.M. Dec. 20, 2005) (finding defendant's claims that the preferred candidate "received the highest score on the specific job-related criteria measured by the panel," and had "specific knowledge, management abilities, and communications skills," to be legitimate reasons for the hiring decision). With respect to interviewing, "[p]oor performance during a job interview is, by itself, a legitimate, nondiscriminatory reason for not hiring a job candidate." *Trentman v. Salazar*, No. 2:08-CV-864 TC, 2011 WL 5117928, at *5 (D. Utah Sept. 26, 2011), *recommendation adopted*, 2011 WL 5117924 (D. Utah Oct. 27, 2011); *see also Gorny v. Salazar*, 413 F. App'x 103, 109 (10th Cir. 2011) (holding defendant had offered legitimate reasons for not hiring plaintiff by introducing testimony that the hired candidate was ranked higher and had "one of the best" interviews); *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1143 (10th Cir. 2009) (finding plaintiff's low ranking among the other interviewees and "poor job interview" were legitimate, non-discriminatory reasons rebutting plaintiff's prima facie discrimination case).

Applied here, Defendant has offered several legitimate, non-discriminatory reasons for its decision to select Mr. Plonsky over Plaintiff for the Customer Relations Manager position. Mr. Aragon testified that while Plaintiff's field experience exceeded

that of Mr. Plonsky's, not all his field experience would translate directly to customer service work, and both candidates would need to learn the customer service side of the position. [#38-1 at WSOF66-67, 71] Mr. Aragon believed that Mr. Plonsky was "much closer" to a stronger "leadership and communication style," and his communication and leadership skills were "far superior" to Plaintiff's. [*Id.* at WSOF77, 81-82] Mr. Aragon testified that while Plaintiff had greater technical skills, it would be easier for Mr. Aragon to teach, and for Mr. Plonsky to learn, the technical aspects of the job, while it would be harder for Plaintiff to gain communication and leadership skills. [*Id.* at WSOF81-82, 84] In the second round of interviews, each of the four interviewers rated Mr. Plonsky higher than Plaintiff in most categories on the rating form, including in education and training, knowledge and technical skills, work experience, communication and interpersonal skills, and leadership. [#38-1, WSOF41-42, 49-50] The interviewers testified that Plaintiff struggled with some questions, while Mr. Plonsky was genuine, thoughtful, prepared and very polished, though he lacked some technical knowledge. [#38-1 at WSOF52-55] These are legitimate, non-discriminatory reasons for Denver Water's decision to hire Mr. Plonsky as the Customer Relations Manager.

In Plaintiff's Brief in Support of Motion for Partial Summary Judgment, Plaintiff argues at length that Mr. Plonsky did not meet the minimum qualifications for the Customer Relations Manager, and therefore Defendant did not have a legitimate, non-discriminatory reason for selecting Mr. Plonsky over Plaintiff. [#32 at 4-13] This argument overlooks Defendant's aforementioned reasons for selecting Mr. Plonsky.[4] And, at this

---

[4] In Plaintiff's response in opposition to Defendant's Motion for Summary Judgment, Plaintiff acknowledges that Defendant's reasons for selecting Mr. Plonsky were his superior analytical, communication, and leadership skills, his experience with Denver

stage of the *McDonnell-Douglas* analysis, Defendant need not persuade the Court that it had convincing, objective reasons for selecting Mr. Plonsky over Plaintiff. *See Burdine*, 450 U.S. at 257. Instead, Defendant's burden is satisfied by simply producing evidence that would allow the jury "rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id.*

As detailed below, Mr. Plonksy's qualifications are relevant to the pretext analysis. Nonetheless, Defendant has presented, and the undisputed facts demonstrate, legitimate, non-discriminatory reasons for Defendant's decision to hire Mr. Plonsky as the Customer Relations Manager. *See, e.g.*, *id.* at 259 ("The fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose him to Title VII liability, although this may be probative of whether the employer's reasons are pretexts for discrimination."); *see also Romero v. City of Albuquerque*, No. CIV 01-0400 MCA/RLP, 2002 WL 35649618, at *3 (D.N.M. Oct. 30, 2002) (finding defendant had articulated legitimate, nondiscriminatory reasons for its hiring decision, including the candidates' interview performances, but concluding there was a genuine issue of material fact whether the hired individuals met the qualifications in the job description, and denying defendant's motion for summary judgment on the pretext prong). Accordingly, Plaintiff's Motion for Partial Summary Judgment [#30], which rests solely on the argument that Defendant did not present legitimate, non-discriminatory reasons for the hiring decision, is **DENIED**.

---

Water's Customer Care & Billing ("CC&B") system, and concerns about Plaintiff's leadership and communication skills. [#36 at 5] These reasons are not discriminatory on their face.

### 2. Plaintiff's Evidence of Pretext

Because Defendant has articulated legitimate, nondiscriminatory reasons for not promoting Plaintiff, the burden shifts to Plaintiff to show a genuine dispute of material fact as to whether Defendant's articulated reasons were a pretext for discrimination. *See Perry*, 199 F.3d at 1135. Summary judgment must be entered for Defendant unless the evidence would allow a jury to find by a preponderance of the evidence that Plaintiff's national origin "actually motivated" Defendant's decision, and had a "determinative influence on the outcome." *Martinez v. Abraham*, No. 03-662 WPJ/ACT, 2004 WL 7337530, at *3 (D.N.M. Nov. 12, 2004) (quoting *Reeves*, 530 U.S. at 141); *see also Martinez v. U.S. Dep't of Energy*, 170 F. App'x 517, 524 (10th Cir. 2006).

"The relevant inquiry is not whether defendants' proffered reasons are correct, but whether defendants 'honestly believed those reasons and acted in good faith upon those beliefs.'" *Cuenca v. Univ. of Kan.*, 265 F. Supp. 2d 1191, 1214 (D. Kan. 2003) (quoting *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1318 (10th Cir. 1999)), *aff'd*, 101 F. App'x 782 (10th Cir. 2004). Plaintiff may demonstrate pretext by presenting evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence." *Bullington*, 186 F.3d at 1317 (quotations omitted), *overruled on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101 (2002).

Here, the Court finds that there is a genuine issue of material fact as to whether Defendant's decision to hire Mr. Plonsky over Plaintiff was pretext for national origin discrimination, for at least two reasons. First, there is a genuine issue of material fact as

to whether Mr. Plonsky was qualified for the Customer Relations Manager position. Second, a jury could find that Defendant ultimately relied on subjective criteria to select Mr. Plonsky over Plaintiff.

### a. Qualifications

"In failure to promote cases, an inference of pretext may be drawn 'where "the facts assure [the court] that the plaintiff is better qualified than the other candidates for the position."'" *Rydzeski v. Curian Capital, LLC*, No. 06-cv-01298-WDM-BN, 2008 WL 465299, at *7 (D. Colo. Feb. 14, 2008) (quoting *Santana v. City & County of Denver*, 488 F.3d 860, 965 (10th Cir.2007)). The Tenth Circuit has "cautioned that 'pretext cannot be shown simply by identifying minor differences between plaintiff's qualifications and those of successful applicants,' but only by demonstrating an 'overwhelming' merit disparity." *Santana*, 488 F.3d at 865 (quoting *Bullington*, 186 F.3d at 1319).

For example, in *Moore v. City of Overland Park*, the court held that a reasonable jury could find that the plaintiff was overwhelmingly better qualified than the selected candidate, and thus conclude the defendant's legitimate, non-discriminatory reason for the hiring decision was pretextual. 950 F. Supp. 1081, 1091 (D. Kan. 1996). In that case, the city had announced an enforcement position, which involved performing field inspections to identify code violations and enforce code compliance by residents and property owners. *Id.* at 1083-84. Candidates were required to have at least one year of experience in a position involving direct public contact, and "[g]overnment or code enforcement experience" was preferred. *Id.* at 1084. Plaintiff had been working for the city for approximately ten years, had been promoted three times, and had conducted property maintenance inspections, actively participated in inspections conducted by

employees in the role she was applying for, and had enforced property maintenance codes, among other experience. *Id.* at 1083, 1090. The position was offered to a candidate who had worked for the city for three summers as a seasonal weed inspector, enforcing city ordinances on excessive vegetation. *Id.* at 1084. The court held that the "uncontroverted evidence demonstrate[d] that the plaintiff had considerably more relevant experience" than the selected candidate, including in property maintenance investigation, code enforcement, and handling public complaints. *Id.* at 1090. *Cf. Trentman*, 2011 WL 5117928, at *6 (finding no evidence of pretext where the preferred candidate's 19 years of experience was "at least comparable, if not superior" to plaintiff's 14 years, and where preferred candidate had significantly more impressive academic credentials and a better interview).

Here, as in *Moore*, the Court looks to the relevant job description posting for guidance in evaluating the relative qualifications of Plaintiff and Mr. Plonsky.[5] The Customer Relations Manager posting listed the following minimum qualifications, in relevant part: a minimum of seven years related work experience, including three years in a supervisory role, or "[a]ny equivalent combination of training, education, and experience that provides the required skills, knowledge, and abilities." [#32-2 at 3] The

---

[5] Plaintiff cites to two other documents as evidence of the pertinent job qualifications— the Class Specification and the Job Description Questionnaire, both completed by Mr. Aragon, which describe the position at the time he had it. [#39-1, DSOF9-15, WSOF 44-46, 49] As noted above, it is undisputed that Mr. Aragon's former role of Customer Service Field Manager preceded, and is distinct from, the Customer Relations Manager position at issue here, though the positions and descriptions thereof bear close similarities. [*See id.*] Plaintiff does not cite to any authority on the weight of such sources when the Court has the actual job description available for its analysis. Even without considering whether these alternative documents had bearing on the qualifications for the Customer Relations Manager position, the Court finds that Defendant is not entitled to summary judgment on Plaintiff's Title VII national original discrimination claims.

posting described numerous essential duties and responsibilities, including "formal supervisory responsibilities over the employees" in the Customer Service Field, i.e. "Meter Shop, Meter Reading, Meter Inspection, Field Service and Central Dispatch." [*Id.* at 1] The Customer Relations Manager supervises and maintains "an ongoing safety program," ensures "the supervision of field personnel, including the testing and certification of new meters, shop and field testing and calibration or replacement of meters, tapping of water mains, setting and inspection of meters and inspecting the work of plumbers and outside contractors." [*Id.* at 1-2]  The Customer Relations Manager also plans meter reading systems and coordinates the installation or relocation of new water services, including proper location of meters and meter reading devices. [*Id.* at 2]  As to skills and competencies, the description listed "[t]horough knowledge of Denver Water's engineering standards and operating rules," "[t]horough knowledge of piping, meters and meter settings," and "[g]ood knowledge of plumbing and hydraulics." [*Id.* at 3]

The job description also listed other essential duties and responsibilities more specifically geared toward leadership and budgetary planning, including building "relationships with external partners to build a better reputation in the water industry," staying "abreast of trends and best practices in the delivery of customer service, metering, meter reading and field services," clearly communicating and inspiring a team towards an organizational vision, and managing the section budget. [*Id.* at 2]  The description noted the ability to communicate effectively orally and in writing. [*Id.* at 3]

A reasonable jury could find that Plaintiff was overwhelmingly more qualified than Mr. Plonsky considering the relevant job qualifications.[6] Plaintiff had worked for Denver Water for over two decades longer than Mr. Plonsky when Mr. Plonsky was selected as the Customer Relations Manager. [*See* #38-1, WSOF3, 34, 92; #39-1, DSOF18, 22] Plaintiff had significantly more exposure to the technical aspects of the job than Mr. Plonsky, from his supervision of field employees to his extensive training in plumbing, hydraulics, and related safety issues. [*See* #38-1, WSOF5-6, DSOF133, 147] In contrast, the undisputed facts indicate that Mr. Plonsky performed predominantly, if not exclusively, finance and accounting work for Denver Water. [#38-1, WSOF34, 92; #39-1, DSOF22; #32-9] Mr. Aragon testified that he did not know whether Mr. Plonsky had any field work, metering, meter-reading system technology, plumbing, basic backflow, or hydraulics experience [#38-1 at DSOF131], even though the job listing required good knowledge of plumbing and hydraulics, and thorough knowledge of piping, meters, and meter settings [#32-2 at 3]. Mr. Aragon testified that Mr. Plonsky had knowledge of standard practices used in meter reading, but no knowledge of those practices for installation, maintenance, testing, or repair of water meters. [#31-6 at 69:17-70:14] Mr. Plonsky had completed one training class in workplace safety, while the remainder of his trainings had been in finance and general management topics. [#38-1 at DSOF148] Plaintiff had also supervised a much larger division of employees than Mr. Plonsky. [#38-1, DSOF149-50]

---

[6] In making this conclusion, the Court does not consider affidavits, submitted by Plaintiff, of Denver Water employees about Mr. Plonsky's job performance after he was hired. [#36 at 9-10; #38-1 at DSOF141-46] The Court must "examine the competing candidates' qualifications only in light of the facts available to the decisionmaker at the time of the decision, not in light of facts that might have been apparent to others or that might have become apparent only in hindsight." *Johnson v. Weld County*, 594 F.3d 1202, 1211-12 (10th Cir. 2010).

Even if the jury could come to a different conclusion, "[w]here different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment." *Brown v. Parker-Hannifin Corp.*, 746 F.2d 1407, 1411 (10th Cir. 1984); *see also Equal Employment Opportunity Comm'n v. Jetstream Ground Servs., Inc.*, 134 F. Supp. 3d 1298, 1320-21 (D. Colo. 2015) (finding "sufficient evidence from which a jury could credit either [defendant's] proffered, legitimate nondiscriminatory reason for [plaintiff's] layoff, or from which it could conclude that she was selected because she regularly wore religious garments," and therefore concluding that summary judgment was precluded (emphasis omitted)).

### b. Subjective Criteria

A jury could also find that Defendant ultimately relied on subjective criteria to select Mr. Plonsky over Plaintiff, and thus could conclude that the hiring decision was pretextual. "[P]retext is typically inferred when 'the criteria on which the employers ultimately rely are entirely subjective in nature." *Martinez*, 170 F. App'x at 523 (emphasis omitted) (quoting *Green v. New Mexico*, 420 F.3d 1189, 1195 (10th Cir. 2005)). Though "the existence of subjective criteria alone is not considered evidence of pretext . . . the existence of other circumstantial evidence may provoke a stronger inference of discrimination in the context of subjective evaluation standards." *Riggs v. AirTran Airways, Inc.*, 497 F.3d 1108, 1120 (10th Cir. 2007).

For example, in *Romero v. City of Albuquerque*, though the employer offered legitimate, nondiscriminatory business reasons for not hiring the plaintiff, the court nevertheless concluded that a jury could find that the hiring decision was pretextual. 2002 WL 35649618, at *3. There, the hiring director testified that he made his decisions "upon

the recommendations that were made to him and the brief interviews that he himself conducted." *Id.* at *2. But some candidates were selected for the positions even though they were not interviewed or recommended by the hiring panel. *Id.* Moreover, the hiring director admitted that he did not review the personnel files or resumes of the candidates, and instead "was primarily interested in the applicants' leadership abilities," rather than their experience in the technical aspects of the job. *Id.* The court determined that there was a genuine issue of material fact as to whether the individuals hired met the qualifications in the job descriptions, and whether the decisionmaker had "substituted his own subjective hiring criteria in place of the more objective qualifications" referenced throughout the rest of the hiring process. *Id.* at *3; *see also Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1218 (10th Cir. 2002) (holding plaintiff satisfied his burden on the pretext prong because a jury could reasonably find that rankings used in the hiring process were based on opinion and wholly subjective).

Here, each of the four interviewers rated Mr. Plonsky higher than Plaintiff in most categories during the second interview. [#38-1, WSOF49-50] It is unclear if these rankings were based on anything but interview performance. [*See* #31-6 at 111:7-20 (Mr. Aragon testifying that the rankings were likely based off the interview and interview responses, but also could have been based upon the information in the application packages, at least in part)] Mr. Aragon testified that he did not have access to Plaintiff's or Mr. Plonsky's personnel files at the time he decided who would be selected for the Customer Relations Manager position, nor did he ask for them. [*Id.* at 78:18-24] Mr. Aragon further testified that he did not look at any of Plaintiff's performance evaluations to see how Plaintiff was rated in terms of his leadership, and did not speak with any

supervisors about Plaintiff's leadership. [*Id.* at 99:12-19] Instead, Mr. Aragon testified that he "wasn't as impressed with [plaintiff's] leadership in responses and his communication." [*Id.* at 98:24-99:4] Mr. Aragon also testified that he considered the feedback of the interviewers on the panel and that he had observed Plaintiff give one presentation, which left him unimpressed, because Plaintiff looked at the screen instead of addressing the audience. [*Id.* at 119:15-121:8] According to Mr. Aragon, he selected Mr. Plonsky for the position because he believed "his leadership and communications skills were far superior" to Plaintiff's, and that Mr. Plonsky "could learn the technical aspects of the job and would be successful in the role." [*Id.* at 121:13-18]

A reasonable jury could conclude from these facts that Mr. Aragon's ultimate decision to hire Mr. Plonsky was exclusively based on subjective factors. Even assuming the rankings of the candidates throughout the interview process were based on objective factors, as they were in the *Romero* case, like the hiring director in *Romero*, Mr. Aragon nevertheless determined that Mr. Plonsky was the better candidate based on how Mr. Aragon perceived Mr. Plonsky's leadership and communication skills in the interview, without reviewing personnel files for either candidate. Likewise, Mr. Aragon's concerns about Plaintiff's leadership abilities were based solely on Plaintiff's interview performance.

Though subjective criteria alone do not suggest pretext, a reasonable jury could conclude that Mr. Aragon's heavy reliance on subjective criteria, combined with Plaintiff's qualifications as compared to Mr. Plonsky's, are evidence that Defendant's hiring decision was pretextual. *See Riggs*, 497 F.3d at 1120. Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Defendant's decision to hire Mr. Plonsky over Plaintiff was pretext for national origin discrimination.

*See Romero*, 2002 WL 35649618, at *4. Accordingly, Defendant's Motion for Summary Judgment is **DENIED** to the extent it seeks summary judgment on Plaintiff's Title VII national discrimination claims.

### 3. § 1981 Claim and Municipal Liability

The analysis of a national origin discrimination claim under Title VII and under 42 U.S.C. § 1981 is identical, except that to prevail on a § 1981 claim, Plaintiff must present additional evidence that a municipal defendant was acting pursuant to a custom of discriminatory employment practices. *Randle*, 69 F.3d at 446 n.6, 446-47; *see also Mitchell v. City & Cty. Of Denver*, 112 F. App'x 662, 671 (10th Cir. 2004) ("Even assuming [plaintiff] demonstrated the prima facie case described above, he has failed to establish another necessary element of his claims against Denver Water—municipal liability.").

In *Monell v. New York City Department of Social Services*, the Supreme Court held that a local government can be sued under 42 U.S.C. §1983 for constitutional violations but cannot be held liable merely because of the unauthorized acts of its agents. 436 U.S. 658, 690-91 (1978). Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. The *Monell* test applies to actions brought under both § 1981 and § 1983. *Randle*, 69 F.3d at 446 n.6; *see also Mitchell*, 112 F. App'x at 671.

A challenged practice constitutes an official policy or custom for § 1981 and § 1983 municipal liability purposes if it is: (1) a formally promulgated policy, (2) a well-settled custom or practice, (3) a final decision by a municipal policymaker or the ratification by such final policymakers of the decisions of subordinates, or (4) deliberately indifferent

training or supervision. *Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1188-89 (10th Cir. 2010); *see also Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 770 (10th Cir. 2013). After identifying the official policy or custom, a plaintiff seeking to establish *Monell* liability must demonstrate causation by showing that the "the official policy [or unofficial custom] is the moving force behind the injury alleged." *Cacioppo v. Town of Vail*, 528 F. App'x 929, 931 (10th Cir. 2013) (quoting *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998)). Finally, the plaintiff must demonstrate "that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Id.* (quoting *Schneider*, 717 F.3d at 769). Thus, for each claim of municipal liability, the plaintiff must establish three elements: (1) official policy or custom, (2) causation, and (3) the requisite state of mind. *Id.*

Here, Plaintiff's municipal liability theory relies on the third prong of the official policy or custom test above. According to Plaintiff, either Mr. Aragon was acting with final policymaking authority, vested in him by Denver Water, in selecting a new Customer Relations Manager, or his decision was ratified by Denver Water "through its vigorous defense of that decision in this lawsuit." [#36 at 15-16]

The Tenth Circuit considers three factors in determining whether an individual is a final policymaker: "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decisions are final—i.e., are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority." *Randle*, 69 F.3d at 448 (quotation omitted). Alternatively, ratification occurs when the policymaker knew and approved of the conduct, thereby adopting the unconstitutional motive. *See Butcher v.*

*City of McAlester*, 956 F.2d 973, 978 (10th Cir. 1992). In other words, Plaintiff must present facts demonstrating that Denver Water affirmatively approved Mr. Aragon's "specific unconstitutional actions, as well as the basis for these actions." *Bryson v. City of Okla.*, 627 F.3d 784, 790 (10th Cir. 2010); *see also Lopez v. City of Tulsa*, No. 09-CV-757-TCK-FHM, 2010 WL 3825395, at *7 (N.D. Okla. Sept. 27, 2010) (collecting cases).

Here, Mr. Aragon was the hiring manager for the Customer Relations Manager position and he ultimately decided to hire Mr. Plonsky. [#38-1, WSOF27, 65, 86; #39-1, DSOF21] Mr. Aragon reports to Sally Covington, the Chief Public Affairs Officer, who is his manager. [#39-1, WSOF71; *see also* #31-2 at 3] Plaintiff has not set forth any evidence with respect to whether Mr. Aragon's decision to hire Mr. Plonsky was limited by certain Denver Water policies, or reviewable by other officials at Denver Water such as Ms. Covington. *Cf. Jantz v. Muci*, 976 F.2d 623, 631 (10th Cir. 1992) (finding school board not liable for school principal's actions because the board had ultimate legal authority to review decisions involving the hiring and firing of employees). Alternatively, under a ratification theory, Plaintiff has not cited to any evidence demonstrating that Denver Water affirmatively approved Mr. Aragon's hiring decision and his rationale for that decision.[7]

The Court thus concludes that Plaintiff has not satisfied his burden of going "beyond the pleadings and set[ting] forth specific facts that would be admissible" at trial

---

[7] Nor is the Court persuaded by Plaintiff's argument that by defending the instant lawsuit, Denver Water ratified an allegedly discriminatory decision by Mr. Aragon. [#36 at 16 (arguing Mr. Aragon's decision was ratified by Denver Water "through its vigorous defense of that decision in this lawsuit")] *See Peters v. City of Biloxi*, 57 F. Supp. 2d 366, 378 (S.D. Miss. 1999) (finding multiple lawsuits filed against the city "no more than suggest that the City was on notice of various civil rights abuses that had been alleged" and therefore did not establish municipal liability).

on Denver Water's municipal liability.  *Adler*, 144 F.3d at 671.  Plaintiff's speculation and conjecture regarding Mr. Aragon's role as a final policymaker, or alternatively, Defendant's purported ratification of Mr. Aragon's decision, is insufficient to create a genuine issue of material fact.  *Bones*, 366 F.3d at 875 (holding evidence must be based on more than mere speculation, conjecture, or surmise to survive motion for summary judgment).  Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** on Plaintiff's Equal Protection national origin discrimination claim asserted under § 1981.

### B.  Retaliation Claims (Claims Two and Four)

In addition to his national origin discrimination claims, Plaintiff brings retaliation claims in violation of Title VII and the Fourteenth Amendment Due Process Clause.  [#1 at 6, 7-8]  Like Plaintiff's discrimination claims, the *McDonnell Douglas* framework applies to the retaliation claims.  *Sorensen v. City of Aurora*, 984 F.2d 349, 353 (10th Cir. 1993). Therefore, Plaintiff must first establish a prima facie case of retaliation and show that: "(1) []he was engaged in opposition to Title VII discrimination; (2) []he was subject to an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action."  *Jones*, 349 F.3d at 1269-70.

Plaintiff's retaliation claims rest on allegations that Defendant failed to promote him as the Customer Relations Manager in 2016, in retaliation for Plaintiff's 2014 complaint that the Sales Administration Supervisor hiring process "was not a straight up equal opportunity."  [*See* #1 at ¶¶ 9-10, 24-25, 32-33; #38-1, WSOF7-17]  Defendant argues that Plaintiff cannot establish a prima facie case of retaliation because first, he presents no evidence that he was engaged in opposition to Title VII discrimination, and second,

because he presents no evidence of a causal connection between the complaint and the hiring decision. [#31 at 16-18]

Because it is undisputed that Mr. Aragon made the hiring decision, and had no knowledge of Plaintiff's complaints in 2014, Plaintiff cannot establish causation and thus the Court need not address the other elements of a prima facie retaliation case. *See In re Ribozyme Pharms., Inc. Sec. Litig.*, 209 F. Supp. 2d 1106, 1111 (D. Colo. 2015) ("If the respondent fails to present competent evidence to establish every element of its claim or defense, entry of summary judgment in favor of the movant is appropriate because the respondent cannot carry its burden of proof."). To demonstrate a causal connection between his complaint and the promotion decision, Plaintiff "must show that the individual who took adverse action against him knew of the employee's protected activity." *Williams v. Rice*, 983 F.2d 177, 181 (10th Cir. 1993).

Mr. Aragon testified that he was not aware before making his hiring decision that Plaintiff had claimed in 2014 that the Sales Administration Supervisor hiring process "was not a straight up equal opportunity." [#31-6 at 126:4-9; *see also id.* at 125:16-126:9] Plaintiff argues that Ms. Garfield, who was involved in the Customer Relations Manager interviews, informed Mr. Aragon that Plaintiff refused to accept interview feedback after he was not selected for the sales supervisor position in 2014. [#36 at 17-18; #36-12 at 58:10-59:16, 60:4-12] But Ms. Garfield also did not know that Plaintiff had made a complaint about the sales supervisor hiring process. [#36-12 at 60:13-21] And regardless, Mr. Aragon, not Ms. Garfield, made the ultimate choice between Plaintiff and Mr. Plonsky. [#38-1, WSOF65]

No reasonable jury could find that there was a causal connection between Plaintiff's June 2014 complaint and Mr. Aragon's 2016 hiring decision, and thus Plaintiff cannot establish a prima facie retaliation claim. *See Jones*, 349 F.3d at 1269 (finding plaintiff failed the causation requirement where she presented "no evidence demonstrating that [the hiring director] was aware of" her allegedly protected conduct, and thus "fail[ed] to show a connection between" that conduct "and the decision not to promote her"); *Robinson v. Reg'l Transp. District*, No. 16-cv-2870-WJM-MJW, 2018 WL 2966881 at *14 (D. Colo. June 13, 2018) ("Absent any indication that [the decisionmakers] knew of [plaintiff's] actions, [plaintiff] cannot establish a prima facie case of retaliatory non-hiring or demonstrate that he could carry his burden of proof at trial."); *Holmes v. Utah Dep't of Workforce Servs.*, No. 2:06-CV-786-TS, 2009 WL 595987, at *6 (D. Utah Mar. 6, 2009) ("In light of the decision-makers' lack of knowledge and the lengthy [nearly two-year] delay between [plaintiff's] protected activity and the alleged retaliatory action, the court concludes that [plaintiff] has failed to establish a prima facie case of retaliation."). Accordingly, Defendant's Motion for Summary Judgment is **GRANTED** on Plaintiff's retaliation claims.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Partial Summary Judgment [#30] is **DENIED**, and Defendant's Motion for Summary Judgment [#31] is **GRANTED in part** and **DENIED in part**. More specifically, the Court holds as follows:

(1)     Plaintiff's Motion for Partial Summary Judgment [#30] is **DENIED**.

(2)     Defendant's Motion for Summary Judgment [#31] on Plaintiff's Title VII national original discrimination claim (Claim One) is **DENIED.**

(3)     Defendant's Motion for Summary Judgment [#31] on Plaintiff's national origin discrimination claim in violation of the Equal Protection Clause under 42 U.S.C. § 1981 (Claim Three) is **GRANTED** and summary judgment is entered in favor of Defendant on Plaintiff's Claim Three.

(4)     Defendant's Motion for Summary Judgment [#31] on Plaintiff's Title VII and Due Process retaliation claims (Claims Two and Four) is **GRANTED** and summary judgment is entered in favor of Defendant on Plaintiff's Claims Two and Four.


DATED:  April 23, 2019                    BY THE COURT:

                                          s/Scott T. Varholak_____
                                          United States Magistrate Judge